Daniel Blau (Cal. Bar No. 305008)
Email: blaud@sec.gov
Tamar Braz (Cal. Bar No. 264080)
Email: brazt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3306
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>YOSSI ENGEL,<br><br>                Defendant. | Case No. 2:23-cv-00213<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national

securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.  Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.  Defendant Yossi Engel, through his company iWitness Tech, LLC ("iWitness"), used his community ties to perpetrate a $47 million affinity fraud – a fraudulent securities offering targeting members of the Orthodox Jewish communities in Los Angeles and New Jersey – between December 2018 and January 2021.

5.  Engel claimed to be seeking capital for a purported business that installed security cameras in Los Angeles. In the first iteration of his scheme, Engel induced members of the Orthodox community to invest by falsely telling them that he would use their funds to purchase security camera equipment that he would later install. In the second iteration of his scheme, he told investors that he would use their funds to purchase property in Israel that he would then develop and sell. Both of these claims were false: rather than use investor money to purchase cameras or develop property, Engel misappropriated the funds by spending investor money for his personal benefit and making Ponzi-like payments to earlier investors in an attempt to keep the scheme going. In total, Engel raised at least $47 million from December 2018 to January 2021 from at least 29 defrauded investors across the country.

## THE DEFENDANT

6.  Defendant Yossi Engel, age 35 years old, is a former resident of Los Angeles, California. Engel has never held any securities licenses, has never been registered with the Commission in any capacity, and has no disciplinary history. In March 2021, after his fraudulent securities scheme collapsed, Engel fled the United States to Israel.

## THE ALLEGATIONS

**A.    Engel Defrauded iWitness Investors**

   **1.    Engel and iWitness**

   7.    iWitness is a California limited liability company formed by Engel in 2018 with its principal place of business in Los Angeles, California.

   8.    Engel was the founder of iWitness. Throughout its existence, iWitness was owned and controlled by Engel, and Engel was its sole member, chief executive officer, and manager.

   9.    iWitness has never been registered with the Commission in any capacity and has never registered any offering of its securities.

   10.    iWitness is now defunct: its registration with the California Secretary of State is suspended, its bank accounts are closed, and its office is closed down.

   11.    iWitness purported to engage in the business of installing security cameras.

   12.    Engel's investors are members of the Orthodox Jewish community primarily located in Los Angeles and New Jersey.

   13.    Engel was an active member of an Orthodox synagogue in Los Angeles. He met investors through the synagogue as well as through introductions from other members of the community.

   14.    Engel cultivated a reputation in the Orthodox Jewish community as a studier of Torah and as a generous donor. He opened his own small synagogue in a room next to his iWitness office, and spent time teaching Torah to others. iWitness investors believed Engel to be trustworthy as well as charismatic.

   15.    Engel, however, exploited the goodwill he engendered through his community activities to engage in a fraudulent securities offering scheme.

   **2.    Engel's Fraudulent Securities Offering and Solicitation of Investors**

   16.    From at least December 2018 to January 2021 (two months before Engel fled the United States), Engel offered investments in iWitness that ranged from

$15,000 to $1.3 million in the form of short-term (from two weeks to six months) loans that provided a high rate of return (between 10% and 60% annualized interest).

17. These investments were frequently memorialized as promissory notes that Engel signed. The notes were also purportedly secured by an iWitness invoice and accompanied by a Hebrew document called a *Heter Iska* that made the investment legal under Jewish religious law.

18. Some iWitness investments were documented orally by Engel or over text message.

19. Engel drafted all investment documentation, including iWitness promissory notes and *Heter Iska* documents, drafted texts to investors, and had ultimate authority over the representations made therein, including their content and whether and how those statements were communicated to investors and potential investors.

20. Whether memorialized orally, in an informal writing, or through a promissory note, Engel represented to all iWitness investors that returns on their investment would be obtained through his and iWitness's security camera installation business and/or land development efforts alleged below. All of the investors understood that they were to receive profits from the efforts of others. The investors understood that they risked the loss of their funds.

21. When investors asked Engel why he didn't borrow money from the bank at a lower rate of interest, he told them that, because he was from Israel, he did not have sufficient credit in the United States.

22. On information and belief, this was false, and the reason Engel could not obtain bank financing was because his businesses were not real.

23. Typically, investors sent money to Engel and iWitness by wire or by check. But, in some instances, Engel told investors to wire funds to another investor. Purported returns were also occasionally wired to investors via a wire from another investor.

24.     Most iWitness investors did not question this flow of funds, but the ones who did were told that they needed to send money via the third party because the third party was capable of changing money in Israel at lower rates than the banks. This was another falsehood.

25.     Engel also lulled iWitness investors in various ways into being comfortable investing with him: he offered to do the initial investment with a credit card that contained fraud protection; he referred investors to others in the community who had invested with him and purportedly successfully earned returns; and he occasionally asked other members of the community to act as guarantors for the investments.

26.     A subset of investors were brought into the scheme by Individual A, who had previously invested in Engel's projects, was unaware of the fraud, and believed the investments would be beneficial to his friends. Individual A acted as a go-between with this subset of investors, who largely did not meet with Engel. Engel provided all information regarding the investments to Individual A, who passed that information along to this subset of investors. Individual A told these investors that their investment would be used to fund Engel's businesses, but that they could characterize the investments as loans to Individual A that Individual A personally guaranteed. These funds were sent directly to Engel and iWitness, and investors understood that their money would be used to fund Engel's camera installation or property development projects. Individual A, who ultimately lost over $700,000 of his own money, is now repaying these investors over $5.7 million because of the guarantees that he signed.

**3.     Engel's False and Misleading Statements About iWitness's Business**

27.     From at least December 2018, Engel represented to investors and potential investors that he needed capital to purchase cameras and other equipment for his purported iWitness business. He further represented to investors and potential investors that he would pay their investment returns from installation fees generated

by iWitness's security camera business.

28.     As one example, at various times in 2018 and 2019, Engel told a potential investor, both orally and via text, that he had a specific camera installation job for which he needed to purchase equipment. Engel represented to the investor that he "got a better deal" when he personally supplied the equipment, that he needed funds to purchase that equipment, and that he would pay the investor his principal and a return after iWitness was paid for the job. Over the course of 2018 and 2019, Engel offered this investor multiple variations on this deal, for different camera installation jobs, in varying amounts (approximately $50,000 to $180,000), with varying terms (approximately 4 weeks to 6 weeks), and for varying rates of return (approximately 10% to 20%). These and the other representations Engel made to investors and potential investors about the nature of iWitness's business and how their investment returns would be generated were false.

29.     In reality, iWitness' camera installation business was never profitable.

30.     Over the course of five years, iWitness only worked on projects worth a total of approximately $10,000 to $20,000 for only 20 to 30 clients.

31.     iWitness employees often performed no work for the installation business.

32.     On information and belief, Engel knew that iWitness's camera installation business was unprofitable. He used investor funds to pay for office rent, cars, and payroll so as to maintain the appearance of a profitable, ongoing business. When investors came to Engel's office, they saw a physical office, employees, and trucks.

33.     Engel's representations about iWitness's operations and the source of investor returns, and the appearance of iWitness as a profitable, ongoing business, were all material to investors' decisions to invest in iWitness.

**4.     Engel's Land Development Scheme**

34.     On or around April 2020, Engel started pitching a different investment

through iWitness. He started telling investors and potential investors that he was developing property in Israel.

35.     Specifically, Engel told investors and potential investors that he had a special relationship with the mayor of Bnei Brak, a town in Israel with a high concentration of Orthodox residents, and that this special relationship allowed him to fast track the development of additional units in apartment buildings.

36.     Engel further told investors and potential investors he would use investor funds to purchase buildings in Bnei Brak, and then remodel the buildings to add additional units, later selling the apartments slightly below market, which would lead to a quick sale and generate a profit.

37.     In connection with this pitch, Engel sent investors and potential investors videos and pictures of an apartment building in Israel, a video of him sitting in the office of the mayor of Bnei Brak (thereby demonstrating his special relationship), copies of purported land registrar documents that showed ownership of the units, and copies of alleged land registrar documents of other apartments he supposedly owned which would act as collateral for the investments.

38.     For example, on or around April 2020, Engel orally told an investor that he had a big real estate project in Israel. Engel told the investor that he was buying two one-story apartments on the top floor of a building because he had special connections that would allow him to get a permit to build a floor on top of these units, which would enable him to build an additional two units. He told the investor that he would complete the project in seven or eight months, and that his plan was to sell the building slightly under the market price, thereby allowing him to flip it quickly and still make a reasonable return. He presented this investor with a contract, pictures of the building and apartment, and the video of himself sitting with the mayor of Bnei Brak.

39.     In reality, as Engel later admitted, there were no such properties.

40.     Engel knew that his land investment scheme was based on lies.

41.     The purported land registrar documents were fake.

42.     The videos of the apartments were also fake; they were only videos of apartments he used to live in, rather than properties iWitness planned to invest him.

43.     The video of Engel with the mayor was a video of him simply saying hello to the mayor of Bnei Brak, with whom he did not have a special relationship.

44.     Engel's representations to investors about his property investment business were material to their decision to invest in iWitness.

**5.      Engel Misappropriated Investor Funds to Make Ponzi-Like Payments**

45.     In reality, Engel was running a Ponzi-like scheme. He used the money he raised from investors to make purported profit distributions to earlier investors, or to fund his lifestyle.

46.     Engel used the investor funds, together with the funds from other sources, to pay for the costs of his business (including rent, payroll, and cars). He also used the funds to pay his personal rent and other living expenses, to make donations, and to fund his synagogue. He sent over $2.5 million to currency exchangers in Israel, and he withdrew over $861,000 in cash. He also used some of the money to fund elements of a lavish lifestyle –he spent $56,880 at casinos and to fly on private jets at least twice.

47.     Excluding what Engel distributed to his investors in illegitimate Ponzi-like payments, Engel directly received $5,918,976 in ill-gotten gains from investors.

**B.     Engel Offered and Sold Securities**

48.     The investment opportunities that Engel offered and sold are securities as either notes or investment contracts.

**1.      The iWitness investments are securities because they are notes**

49.     Investors received documents styled as promissory notes that set forth principal and interest payments, in addition to a religious document that rendered the investments as legal under Jewish religious law.

50.     Investors were primarily motivated by the generation of profits when

investing in iWitness notes.

51.    iWitness note investors reasonably expected that they were making an investment.

52.    There is no regulatory scheme or factor that significantly reduced the risk of the iWitness investments, such that a court should not apply the federal securities laws to Engel's note offering.

**2.    The iWitness investments are securities because they are investment contracts**

53.    iWitness investors transferred money to Engel and iWitness and they risked the loss of those funds.

54.    iWitness investor funds were pooled in iWitness's and Engel's bank accounts.

55.    iWitness investors were dependent on Engel to install cameras or develop property in Israel in order to make an investment profit.

56.    Engel's fortunes were tied to those of his iWitness investors.

57.    Engel promised significant returns to iWitness investors, who would only receive those returns through Engel's and iWitness's efforts to buy camera equipment and install it for a profit, or their efforts to buy, develop, build, and sell properties in Israel at a profit.

58.    Based on Engel's representations about their investment, iWitness investors reasonably believed that iWitness and Engel would perform all of the services necessary to generate investment returns, and that iWitness and Engel were wholly responsible for deriving those returns for entirely passive iWitness investors.

**C.    Engel's Scienter and Unreasonable Conduct**

59.    At all relevant times, Engel acted with scienter, or at a minimum, was deliberately and consciously reckless, and his unreasonable conduct was negligent.

60.    Engel did, or directed, all of iWitness's fundraising from investors.

61.    Engel made all of the false and misleading statements communicated to

investors that concerned their investments in iWitness.

62.    Engel controlled iWitness's bank accounts and directed all of the Ponzi-like payments made by iWitness.

63.    At the end of December 2020, Engel's scheme collapsed. Engel, who had been urging investors to roll over their investments or agree to additional time for repayment, was unable to solicit additional investments to cover his obligations, and he fled the United States.

64.    After a flurry of emails in which he apologized for ruining people's lives due to his "sickness," he briefly returned and, during that time, he met with some investors who were attempting to salvage their losses.

65.    Engel eventually signed a notarized statement on or around February 7, 2021, admitting to securities fraud, and he participated in a recorded meeting with several investors on or around March 2021 in which he admitted that he was running a Ponzi scheme.

66.    During that meeting, Engel made a series of admissions regarding iWitness's fraudulent securities offering.

67.    He admitted that iWitness's security camera installation business was never profitable.

68.    He admitted that iWitness's represented property development business in Israel was a fiction because there were never any investment properties.

69.    He admitted that the property deeds he had provided iWitness investors were fake.

70.    He admitted that the videos of the apartments he had provided iWitness investors were just videos of apartments he had resided at in the past.

71.    He admitted that the video of his meeting with Bnei Barak's mayor was simply a greeting and that he had no special relationship with the official.

72.    Although Engel told investors that he would try to pay them back at that time, he fled to Israel shortly thereafter and has not returned to the United States.

COMPLAINT                                                10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

73.    The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

74.    Engel engaged in a fraudulent scheme in which he raised over $47 million through the sale of securities by, among other things: telling investors that iWitness would use the funds to purchase camera equipment or develop property, when, in fact, the funds were used to make Ponzi-like distributions to other investors and for Engel's personal benefit; falsely representing to investors that iWitness had a profitable and ongoing business of installing camera equipment; omitting to tell investors that returns had been paid from new investor funds; telling investors that he was borrowing from retail investors instead of banks because of insufficient credit when, in fact, Engel was perpetrating a fraud; telling investors who received funds from, or sent funds to, other investors that the reason for this flow of funds was to reduce the costs of exchanging currencies when, in fact, the funds were Ponzi distributions; providing investors with false documents that purported to show that Engel owned properties in Israel as well as false documents that purported to show that Engel owned properties that could serve as collateral; and providing investors with pictures of apartments that he was going to develop when, in reality, the pictures merely depicted pictures of an apartment he used to live in. Engel knew or was reckless in not knowing that the above misstatements and omissions were false or misleading.

75.    By engaging in the conduct described above, Engel, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact

COMPLAINT

11

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

76.     By engaging in the conduct described above, Engel violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

77.     The SEC realleges and incorporates by reference paragraphs 1 through 72 above.

78.     Engel engaged in a fraudulent scheme in which he raised over $47 million through the sale of securities by, among other things: telling investors that iWitness would use the funds to purchase camera equipment or develop property, when, in fact, the funds were used to make Ponzi-like distributions to other investors and for Engel's personal benefit; falsely representing to investors that iWitness had a profitable and ongoing business of installing camera equipment; omitting to tell investors that returns had been paid from new investor funds; telling investors that he was borrowing from retail investors instead of banks because of insufficient credit when, in fact, Engel was perpetrating a fraud; telling investors who received funds from, or sent funds to, other investors that the reason for this flow of funds was to reduce the costs of exchanging currencies when, in fact, the funds were Ponzi distributions; providing investors with false documents that purported to show that Engel owned properties in Israel as well as false documents that purported to show that Engel owned properties that could serve as collateral; and providing investors with pictures of apartments that he was going to develop when, in reality, the pictures

merely depicted pictures of an apartment he used to live in. Engel knew or was reckless in not knowing that the above misstatements and omissions were false or misleading.

79.     By engaging in the conduct described above, Engel, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

80.     By engaging in the conduct described above, Engel violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Engel committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Yossi Engel, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Order Engel to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) & 78u(d)(7)].

### IV.

Order Engel to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: January 12, 2023

*/s/ Daniel Blau*
Daniel Blau
Attorney for Plaintiff
Securities and Exchange Commission